## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ALPHA IBRAHIM BAH MANSARAY,** | ) ) ) |
| *Plaintiff,* | ) **PETITION FOR A WRIT OF** ) **HABEAS CORPUS AND** |
| **v.** | ) **COMPLAINT FOR INJUNCTIVE** ) **AND DECLARATORY RELIEF** |
| **JACK KAVANAUGH, in his official capacity as Director, Howard County Detention Center;** | ) ) **CIVIL ACTION NO. _____** ) |
| **JANEAN OHIN, in her official capacity as Acting Baltimore Field Office Director, U.S. Immigration and Customs Enforcement;** | ) ) ) **REQUEST FOR ORAL** ) **ARGUMENT** |
| **MATTHEW T. ALBENCE, in his official capacity as Deputy Director and Senior Official performing the duties of the Director of the U.S. Immigration and Customs Enforcement;** | ) **REQUEST FOR AN EXPEDITED** ) **HEARING** ) ) ) ) |
| **WILLIAM P. BARR, in his official capacity as Attorney General of the United States;** | ) ) ) ) |
| **and** | ) ) |
| **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;** | ) ) ) |
| *Respondent-Defendants.* | ) |

## PETITION FOR A WRIT OF HABEAS CORPUS AND
## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, Alpha Ibrahim Bah Mansaray, by and through his undersigned counsel, asks this

Court to issue a Writ of Habeas Corpus and order his immediate release or placement in

community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that his continued detention violates the Due Process Clauses of the 5th Amendment to the U.S. Constitution and/or the Rehabilitation Act.  In the alternative, Plaintiff asks this Court to issue injunctive relief ordering Defendants to immediately release him or place him in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that his continued detention violates the Due Process Clauses of the 5th Amendment to the U.S. Constitution and/or the Rehabilitation Act.

Plaintiff also asks that this Court declare that Defendants' continued civil detention of individuals at increased risk for severe illness, including persons with underlying medical conditions that increase the risk of serious illness or death upon contracting COVID-19 violates the Due Process Clauses of the 5th Amendment to the U.S. Constitution and/or the Rehabilitation Act.

Plaintiff further asks that this Court award him all costs incurred in maintaining this action, including reasonable attorneys' fees under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified by law.

## I. INTRODUCTION

1.     This civil action presents a request for immediate relief on behalf of Plaintiff, who is highly vulnerable to serious injury and death if he contracts COVID-19, a lethal disease that has swept the globe.  Respondent-Defendants ("Defendants") are holding Plaintiff in civil immigration detention in a detention facility located in Jessup, Howard County, Maryland.  *See,* Exhibit A.

2.     The COVID-19 global pandemic, caused by the novel coronavirus, has been characterized as the worst the world has seen since 1918.  States and countries around the world –

including the State of Maryland – have declared a State of Emergency and have shut down nonessential businesses, restricted public gatherings, and have imposed "stay-at-home" orders in an attempt to control the spread of the disease.  To date, over five (5) million people worldwide have been diagnosed with COVID-19, with over a million and a half (1,500,000) of them inside the United States.[1]  More than three hundred thirty thousand (330,000) individuals worldwide have died as a result of COVID-19, including more than ninety thousand (90,000) in the United States.[2]

3.      Maryland has seen a significant COVID-19 outbreak.  The Governor of Maryland has declared a State of Emergency, issued a stay-at-home order, and put in place widespread social distancing measures, including shutting down nonessential businesses and all public gatherings.[3] As of the date of the filing of this petition, there are over forty-five thousand (45,000) confirmed cases and over two thousand one hundred (2,100) deaths in the State of Maryland, and the numbers are still rising.[4]

4.      Public health experts, including the Centers for Disease Control and Prevention ("CDC"), have instructed that the only effective way to reduce the risk of severe illness or death for vulnerable individuals is social distancing and improved hygiene.  Such distancing and hygiene measures are impossible to achieve in crowded detention centers.  For this reason, more than 3,000 medical professionals have urgently requested that Immigration and Customs Enforcement ("ICE") immediately release those detained in their custody, and two doctors who are medical experts for the Department of Homeland Security ("DHS") have sent a warning to the agency in

---

[1] Coronavirus disease (COVID-19) Situation Report – 124, 1, 6, World Health Organization (May 23, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200523-covid-19-sitrep-124.pdf?sfvrsn=9626d639_2.
[2] *Id.*
[3] *See,* https://governor.maryland.gov/2020/03/12/governor-hogan-announces-major-actions-to-protect-public-health-limit-spread-of-covid-19-pandemic/.
[4] *See,* https://coronavirus.maryland.gov/.

February 2020, noting that keeping people detained poses "an imminent risk to the health and safety of immigration detainees" and to the general public.[5]

5.      Confirmed cases have begun to appear in immigration detention centers across the country,[6] and at least one nurse who is employed at the Howard County Detention Center ("HCDC") has tested positive for COVID-19.[7]  Plaintiff has been notified by the Howard County Detention Center that there has since been a second and third staff members infected, but specific details have not been provided as to which staff members were infected.  It is impossible for people confined in prisons, jails, and detention centers to engage in the necessary social distancing and hygiene because people eat, sleep, and engage in activities in close proximity to one another, and basic supplies such as soap and hand sanitizer are often in short supply or completely unavailable at those facilities.[8]  Even with the measures ICE has purported to take to prevent the spread of COVID-19 in its facilities, immigration detention centers are a hotbed for spread of the virus.

6.      Despite the efforts made to keep the HCDC free from COVID-19, the HCDC has exposed its detainees to COVID-19 and the increased risk of sickness and mortality.[9]

---

[5] Letter from Dr. Scott Allen and Dr. Josiah Rich, Medical Experts for DHS, to House Comm. on Homeland Sec. (Mar. 19, 2020), *available at* https://www.documentcloud.org/documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html#document/p4/a557238; Catherine E. Shoichet, Doctors Warn of 'Tinderbox Scenario' if Coronavirus Spreads in ICE Detention, CNN (Mar. 20, 2020), *available at* https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.

[6] U.S. Immigration and Customs Enforcement, ICE Guidance on COVID-19 (accessed May 23, 2020), https://www.ice.gov/coronavirus.

[7] *Coreas v. Bounds*, 8:20-cv-00780-TDC, Dkt. No. 87 (D. Md. Apr. 30, 2020) (noting that ICE reported that a nurse at the HCDC tested positive on April 23, 2020), at page 2 ("*Coreas II*").

[8] Keri Blakinger and Beth Schwartzapfel, *When Purell is Contraband, How Do You Contain Coronavirus?*, the Marshall Project (Mar. 6, 2020), *available at* https://www.themarshallproject.org/2020/03/06/when-purell-is-contraband-how-do-you-contain-coronavirus.

[9] *See, Coreas v. Bounds,* 8:20-cv-00780-TDC, Dkt. No. 56 (D. Md. Apr. 3, 2020) (denying preliminary injunction until evidence shows that COVID-19 has been exposed to the detainees at HCDC) ("*Coreas I*") and *Coreas II, supra*.

7.     Plaintiff is detained in the Howard County Detention Center and has previously suffered from pneumonia in his middle and lower right lung.  Plaintiff suffered this pneumonia in February 2018 after being intubated for surgery.  This pneumonia may have also affected his left lung.  *See,* Exhibit B, pages 2-3.

8.     Plaintiff's medical history, including recent "aspiration pneumonia", places him at high risk for severe illness, respiratory complications, and death, should he contract COVID-19.[10]

9.     Plaintiff's medical history also includes right testicular torsion, which led to his undergoing an orchidectomy (removal) of his right testicle.  *See,* Exhibit B, page 2.

10.    Since he began his detention at the HCDC, Plaintiff has been seen by a nurse at that facility numerous times, during which he has complained of pain in his remaining (left) testicle.

11.    The surgeons who performed Plaintiff's orchidectomy at the Greater Baltimore Medical Center ("GBMC") told him that he may suffer from the same condition (testicular torsion) in his left testicle, and that he should consult with a urologist if he has any left testicle pain.  *Id.*

12.    To date, and due to his ongoing detention, Plaintiff has not been able to consult with a urologist about his continuing left testicular pain.

13.    Plaintiff fears for his life because he is especially vulnerable to serious illness or death if infected by COVID-19 due to his pre-existing medical condition and medical history.  Plaintiff is afraid for good reason: he is trapped in a facility which can only be described as a breeding ground for disease.  Despite warnings and please for release from public health experts and advocates, Defendants have chosen to continue to confine Plaintiff in close proximity to other detainees, without sufficient soap and/or hand sanitizer; to refuse to administer adequate levels of

---

[10] *See,* Danny Hakim, *Asthma is Absent Among Top Covid-19 Risk Factors, Early Data Shows,* (April 16, 2020, updated April 20, 2020), *available at* https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.

COVID-19 testing or screening; to refuse to implement cleaning and protection procedures adequate to combat COVID-19; and to resist releasing even the most medically vulnerable individuals.  The conditions and treatment at the HCDC have created dangerous situations that threaten Plaintiff's life, the lives of other detainees, as well as the well-being of staff, others in the surrounding community, and the general public.

14.     Under these circumstances, Plaintiff's release is the only meaningful way to mitigate the risk of his contracting COVID-19 and potentially dying of respiratory complications, including Acute Respiratory Distress Syndrome ("ARDS") and pneumonia, both of which can lead to lung failure.  Lung failure leads to the requirement of life-preserving ventilator use.  Individuals with existing damage to their heart or lungs are at much higher risk of life-threatening complications from COVID-19.[11]  The long-term effects of suffering pneumonia have been studied, and those who have suffered pneumonia may not recover to their prior level of health and physical activity.[12]

15.     Recognizing the urgency of this situation, federal courts around the country, and in this District, have ordered releases of detained and incarcerated individuals, including those detained in ICE detention facilities.  *See,* discussion, *infra*, and *Coreas I and II*, *supra*.

16.     As set forth below, the danger posed by Plaintiff's detention during this COVID-19 pandemic is "so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk" and violates their constitutional right to safety in government custody. *See, Helling v. McKinney,* 509 U.S. 25, 36 (1993).  Plaintiff's continued detention also violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.,* because Defendants are failing to

---

[11] *See,* https://www.medicalnewstoday.com/articles/is-coronavirus-deadly#effects-on-the-body.
[12] *See,* www.wkhs.com/health-resources/healthlibrary/article?chunkid=889655&lang=English&db=hlt

provide an appropriate accommodation for Plaintiff's medical disability.

17.     Without this Court's intervention, Plaintiff continues to be at imminent risk of severe illness or death.

## II.  JURISDICTION AND VENUE

18.     This action arises under the Due Process Clauses of the Fifth Amendment to the United States Constitution and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*

19.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (waiver of sovereign immunity), 28 U.S.C. § 1346 (original jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause).

20.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 2241(a) and pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).

## III.  THE PARTIES

21.     Plaintiff, Alpha Ibrahim Bah Mansaray, is an adult citizen of the Denmark.  *See,* Exhibit C.  He is currently detained by ICE at the Howard County Detention Facility in Jessup, Maryland.  *See,* Exhibit A.

22.     Plaintiff suffered from aspiration pneumonia as the result of intubation for surgery in February 2018.  *See,* Exhibit B.  As a result of this hospital-acquired respiratory infection, Plaintiff is at increased risk of severe illness, complications, or death, from COVID-19.  *Id.*

23.     If released, Plaintiff will reside at his mother's residence at 8807 Howard Hills Drive, Savage, MD 20763, where he can socially isolate in his mother's basement.  *See,* Exhibit A.  Plaintiff's mother is Ms. Sayoh Mansaray.  *See, Verification, infra.*

24.     Respondent-Defendant Jack Kavanaugh is the Director of the Howard County Detention Center.  As Director, he is responsible for overseeing the administration and

management of the HCDC Center, where Plaintiff is detained.  Defendant Kavanaugh is a legal custodian of Plaintiff.  He is sued in his official capacity only.

25.     Respondent-Defendant Janean Ohin is the Acting Baltimore Field Office Director for U.S. Immigration and Customs Enforcement.  The Baltimore Field Office is responsible for carrying out ICE's immigration detention operations at all Maryland detention centers that house immigration detainees, including the HCDC.  Defendant Ohin is a legal custodian of Plaintiff.  She is sued in her official capacity only.

26.     Respondent-Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE.  Defendant Albence is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Albence is a legal custodian of Plaintiff.  He is sued in his official capacity only.

27.     Respondent-Defendant William P. Barr is the Attorney General of the United States, and is being sued in his official capacity only.

28.     Respondent-Defendant ICE is a federal law enforcement agency within the U.S. Department of Homeland Security ("DHS").  ICE is responsible for the criminal and civil enforcement of U.S. immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system.  Defendant ICE is a legal custodian of Plaintiff.  *See,* Exhibit A.

## IV.  STATEMENT OF FACTS

### A.  COVID-19 Poses Grave Risk of Harm, Including Serious Illness or Death, to Those with Certain Underlying Medical Conditions.

29.     COVID-19 is a coronavirus that has reached pandemic status.  To date, over five (5) million people worldwide have been diagnosed with COVID-19, with over a million and a half

(1,500,000) of them inside the United States.[13]  More than three hundred thirty thousand (330,000) individuals worldwide have died as a result of COVID-19, including more than ninety thousand (90,000) in the United States.[14]  These numbers grow each day.

30.     Nationally, CDC projections indicate that over 200 million individuals in the United States could be infected with COVID-19 over the course of the pandemic without effective public health intervention, with as many as 1.7 million deaths in the worst projections.[15]

31.     COVID-19 is a highly contagious disease that is easily transmitted through respiratory droplets, especially when one is within six feet of an infected individual, and in some cases when one is within 27 feet.[16]  Its symptoms include fever, cough, and shortness of breath.[17]

32.     People can also spread COVID-19 but be asymptomatic,[18] making testing or seclusion of only those who are exhibiting symptoms an ineffective solution.

33.     COVID-19 can result in respiratory failure, kidney failure, and death.  Infected individuals who do not die from the disease can face serious damage to the lungs, heart, liver, or

---

[13] Coronavirus disease (COVID-19) Situation Report – 124, 1, 6, World Health Organization (May 23, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200523-covid-19-sitrep-124.pdf?sfvrsn=9626d639_2.

[14] *Id.*

[15] Coronavirus disease (COVID-19) Situation Report – 79, 1, 6, 9, World Health Organization (April 8, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200408-sitrep-79-covid-19.pdf?sfvrsn=4796b143_6.

[16] Bourouiba, Lydia, Journal of the American Medical Association, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19* (Mar. 26, 2020), *available at* https://jamanetwork.com/journals/jama/fullarticle/2763852?appId=scweb.

[17] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19)*, available at https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[18] A study in Iceland, where COVID-19 testing is widespread, found that about half of those tested positive have no symptoms.  Jason Gale, Coronavirus Cases Without Symptoms Spur Call for Wider Tests, Bloomberg (Mar. 22, 2020), *available at* https://www.bloomberg.com/news/articles/2020-03-22/one-third-of-coronavirus-cases-mayshow-no-symptom-scmp-reports.

other organs, resulting in prolonged recovery periods, including extensive rehabilitation from neurological damage and loss of respiratory capacity.

34.     COVID-19 can also severely damage lung tissue, affect cardiac functions, and cause widespread damage to other organs.  These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or less.

35.     Individuals with certain medical conditions face greater chances of serious illness or death from COVID-19.  Certain underlying medical conditions increase the risk of serious COVID-19 disease for individuals of any age, including lung disease, chronic liver or kidney disease, diabetes, epilepsy, hypertension, compromised immune systems, blood disorders, inherited metabolic disorders, stroke, and pregnancy.

36.     Even some younger and healthier individuals who contract COVID-19 may require supportive care.  And those who develop serious complications will need advanced support, including highly specialized equipment that is in limited supply and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.  This level of support is especially difficult to provide to detained individuals.

37.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.  According to recent estimates, the fatality of people infected with coronavirus is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.

38.     Patients in high-risk categories who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation.

39.     There is no vaccine against COVID-19, nor is there any known medication to prevent or cure infection from the virus.

40.     The only known effective measure to reduce the risk of severe illness or death to vulnerable individuals is to prevent them from being infected with the coronavirus.  Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures to prevent infection.

41.     These practices are not possible in detention facilities, where large numbers of people are housed in close quarters in congregate settings, with minimal access to sinks, showers, toilets, water, personal hygiene, and facility cleaning supplies.

**B.  Plaintiff Is Particularly Vulnerable to Serious Illness or Death if Infected by COVID-19 Due to His Underlying Health Condition.**

42.     Individuals with certain pre-existing medical conditions face dramatically higher chances of serious illness or death from COVID-19.  Individuals detained in immigration detention centers, like Plaintiff, are also more susceptible to experiencing complications from infectious diseases than the population at large.  This is especially true for individuals with underlying conditions such as diabetes, lung disease, kidney disease, and other illnesses.

43.     Infectious disease outbreaks such as COVID-19 can also exacerbate existing mental health conditions and contribute to the development of new mental health conditions.

44.     Plaintiff is an individual who is particularly vulnerable to serious illness or death if infected by COVID-19 and who is currently detained at the HCDC as he awaits adjudication of his immigration ("removal") case.  *See,* Exhibit A.

45.     Plaintiff suffered from aspiration pneumonia in February 2018, after undergoing surgery in Maryland.  He presented at the Greater Baltimore Medical Center's emergency room at

least twice, complaining of shortness of breath and tachypnea (abnormal rapid breathing, defined as a rate greater than 20 breaths per minute).  Plaintiff's medical records from GBMC list the following as the reason for his pneumonia – "R. testicular torsion s/p orchiectomy with subsequent aspiration PNA/pneumonitis post-extubation" and "Pneumonitis due to aspiration during anesthesia."  *See,* Exhibit B, pages 1 and 3.

46.     After surgery, Plaintiff "was extubated, then developed laryngospasm and bit his tongue, which bled.  He then became hypoxic.  His tongue is no longer bleeding.  He is coughing up pink frothy secretions."  *Id.,* page 9.

47.     X-rays of Plaintiff's chest taken by GBMC revealed, "Ill-defined patchy area of opacity scattered throughout the mid and lower lung with sparing of the right costophrenic angle and right lung apex.  Ill-defined increased density to the bronchovascular markings in the upper left perihilar region possibly extending into the retrocardiac left lower lung…"  *Id.*, page 3.

48.     The reviewing physician's opinion was that Plaintiff suffered from, "Scattered areas of pneumonia in the right mid lower lung.  Peribronchial inflammatory changes are suspected in the left perihilar region and possibly the retrocardiac left lower lobe.  Findings could be secondary to aspiration pneumonia.  Pneumonia from other etiologies, including viral pneumonia, could also cause or contribute to these findings if the patient was symptomatic prior to surgery."  *Id.*  Regardless of the cause, Plaintiff was diagnosed with pneumonia in at least one lung at age 18.

49.     Plaintiff's history of serious lung disease leaves him critically vulnerable to the coronavirus and to serious illness or death from COVID-19 because of his pre-existing medical condition.

50.     Plaintiff's surgeon told him that his testicular torsion condition could recur in his left testicle, and that he should contact his urologist if he experiences any pain in his left testicle.

51.     Plaintiff has asked to see the nurse at the HCDC numerous times since he began his detention there, and has repeatedly raised concerns about his continuing testicular pain.  Plaintiff needs to see his urologist, but has not been permitted to do so.

52.     Plaintiff's health conditions qualify as a disability under the Rehabilitation Act.

**C. Detained Immigrants in Maryland Facilities Face an Elevated Risk of Contracting COVID-19.**

53.     The Howard County Detention Center is located in central Maryland, which is experiencing a coronavirus outbreak leading to a "stay-at-home" order, prohibiting individuals from leaving their home unless the reason for doing so falls under certain very limited exceptions, such as to obtain food, medicine, or medical attention.  Maryland Governor Lawrence J. Hogan, Jr. renewed this "stay-at-home" order as recently as May 6, 2020.[19]  The Maryland Governor is currently operating under a "Safer at Home" Order, which still largely closes off completely re-opening Maryland.

54.     As of May 23, 2020, there were over 45,000 confirmed COVID-19 cases and over two thousand one hundred (2,100) deaths in the State of Maryland.[20]  The number of infected people in Maryland continues to rise.  There is an immediate and impending threat that the coronavirus will spread uncontrollably in the Howard County Detention Center.

---

[19] State of Maryland, Proclamation, *Renewal of Declaration of State of Emergency and Existence of Catastrophic Health Emergency – COVID-19* (May 6, 2020), available at https://governor.maryland.gov/wp-content/uploads/2020/05/3rd-Renewal-of-State-of-Emergency-5.6.20.pdf.  This Proclamation includes the observation that, "COVID-19 is a highly infectious respiratory disease that spreads easily from person to person, physically contaminates property by attaching to surfaces for prolonged periods of time, and may result in serious illness or death" and "COVID-19 is a public health catastrophe and has been confirmed in all Maryland counties." *Id.*
[20] *See,* https://coronavirus.maryland.gov/.

55.     Outbreaks of infectious diseases are extremely common in confined detention centers.   Individuals who are imprisoned or detained cannot protect themselves by social distancing as they could in the community.   Congregate settings such as jails, prisons, and detention facilities allow for rapid spread of infectious diseases that are transmitted person to person, especially those – like COVID-19- transmitted by droplets through coughing and sneezing.

56.     COVID-19 is spreading quickly in other jails, prisons, and immigrant detention centers in the United States.  Rikers Island in New York City saw the number of cases in its facility spike from one to nearly 200 in twelve days.[21]   A federal prison in Oakdale, Louisiana has experienced such a rapid spread of the disease within its walls that it has stopped testing people and its staff are now presuming that anyone showing symptoms inside the prison is positive of COVID-19.[22]  As of May 22, 2020, at least six (6) people have died of COVID-19-related illnesses in Maryland prisons.  These deaths occurred at the Jessup Correctional Institute, the Patuxent Institution, and the Dorsey Run Correctional Facility, all located in Jessup, Maryland, as well as the Roxbury Correctional Institution in Hagerstown and the Central Maryland Correctional Facility in Sykesville, Maryland.  Despite these deaths, few Maryland prisoners or detainees have been tested for COVID-19 or supplied with proper personal protective equipment.  Maryland officials just last week announced a plan to test all Maryland prisoners and prison staff.[23]

---

[21] Miranda Bryant, *Coronavirus Spread at Rikers is a 'Public Health Disaster', Says Jail's Top Doctor,* The Guardian (Apr. 1, 2020), *available at* https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster.

[22] Greg LaRose, *Oakdale Federal Prison Stops Testing Inmates With COVID-19 Symptoms,* WSDU News (Mar. 31, 2020), *available at* https://www.wdsu.com/article/oakdale-federal-prison-stops-testing-inmates-with-covid-19-symptoms/31989498 (due to rapid spread of COVID-19 inside Oakdale Federal Correctional Center, officials are presuming anyone who shows symptoms is positive for COVID-19).

[23] Phillip Jackson, *Lockdowns, strict measures making life difficult for Maryland prisoners. But are they keeping them alive?,* The Baltimore Sun (May 22, 2020), *available at*

57.     This Court has previously noted that COVID-19 has been found present in the Howard County Detention Center, where Plaintiff is currently detained.  *See, Coreas II, supra.*

58.     Given the shortage of COVID-19 tests kits in the United States, generally, these detention facilities (including the HCDC), cannot currently conduct aggressive, widespread testing to identify and track all COVID-19 cases.  In at least two Maryland ICE detention facilities, ICE admitted that it did not have any test kits and had not tested anyone in those facilities, despite detaining individuals who had exhibited symptoms of COVID-19.  *See, Coreas I, supra.*

59.     It is equally impossible for detention facilities to consistently and adequately screen detained individuals and staff for new, asymptomatic infection.

60.     The conditions in the Howard County Detention Center remain woefully inadequate to protect Plaintiff and the other detained individuals against this life-threatening illness.

61.     This Court has previously found that conditions in the Howard County Detention Center are so dangerous for contracting COVID-19 that it recently ordered the release of Mauricio Coreas. *See, Coreas v. Bounds,* 8:20-cv-00780-TDC, Dkt. No. 88 (D. Md. Apr. 3, 2020).  This Court has previously found that conditions in the Howard County Detention Center are so dangerous for contracting COVID-19 that it recently ordered the release of Mauricio Coreas. *See, Coreas v. Bounds,* 8:20-cv-00780-TDC, Dkt. No. 88 (D. Md. Apr. 3, 2020).

62.     This Court has previously found that detention of a civil detainee with a high-risk health condition in a facility exposed to the Coronavirus likely imposes unconstitutional punishment because the conditions bear no reasonable relationship to the purpose of the detention,

---

https://www.baltimoresun.com/coronavirus/bs-md-less-time-families-inmates-jessup-coronavirus-20200522-kfc72nzbszajvj6f4xsujldefi-story.html.

and is not dependent on the specific mitigation measures present at the HCDC.[24]

63.    This Court previously noted that its decision to order the transfer of Mr. Coreas from the HCDC to home confinement was consistent with that of other federal courts that have ordered the release or transfer of immigration detainees with high-risk health conditions who are at risk of exposure in ICE detention facilities.[25]

## V.  LEGAL FRAMEWORK

### A.  Plaintiff Has a Right to be Free from Punitive Conditions of Confinement in Civil Detention

64.    The government has a duty to provide conditions of reasonable health and safety to individuals in their custody.  As the Supreme Court has explained, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *See, Deshaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 199-200 (1989).  As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety."  *Id.* at 200.

65.    Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass.  *See, Helling,* 509 U.S. at 33 ("It would be off to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.")

66.    The Supreme Court has explicitly recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens

---

[24] *See, Coreas I,* at *11-12, and *Coreas II,* at *5.
[25] *See, Coreas II,* at *5-6.

"reasonable safety" even under the higher standard imposed by the Eighth Amendment. *Id.*

67.    Because persons in immigration detention are civilly confined, their constitutional protections are derived from the Fifth Amendment, which provides greater protections than the Eighth Amendment. Under the Fifth Amendment, persons who, like Plaintiff, are held in civil detention are entitled to "more considerate treatment and conditions of confinement" than persons who are incarcerated because of a criminal conviction. *See, Youngberg v. Romeo,* 457 U.S. 307, 322 (1982). Due process rights of those in civil immigration detention "are at least as great as the Eighth Amendment protections" available to those convicted of a crime. *See, City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983) (emphasis added); *See also, Zadvydas v. Davis,* 533 U.S. 678, 690 (2001) (classifying immigration detention as civil detention).

68.    The Eighth Amendment, which applies to persons being penalized for conviction of criminal offenses, allows punishment as long as it is not cruel and unusual, but the Fifth Amendment's due process protections do not allow punishment at all. *See, Bell v. Wolfish,* 441 U.S. 520, 535, n.16 (1979) ("Due process requires that a pretrial detainee not be punished.") *See also, Nelson v. Collins,* 659 F.2d 420, 425 (4th Cir. 1981).

69.    In order to establish that a particular condition of detention constitutes impermissible punishment, a plaintiff must show either an expressed intent to punish, or a lack of a reasonable relationship to a legitimate governmental purpose, from which an intent to punish may be inferred. *See, Wolfish,* 441 U.S. at 538; *See also, Martin v. Gentile,* 849 F.2d 863, 870 (4th Cir. 1988). Absent an explicit intention to punish a detained person, a court "must evaluate the evidence and ascertain the relationship between the actions taken against the detainee and the custodian's supporting rationale." *See, Williamson v. Stirling,* 912 F.3d 154, 187 (4th Cir. 2018). "That inquiry turns on whether the actions taken may validly be attributed to an alternative,

nonpunitive rationale, and whether they appear 'excessive in relation to the alternative purpose assigned.'" *Id.* (citations omitted).

**B. Defendants May Not Act with Deliberate Indifference to a Substantial Risk of Harm Faced by Plaintiff**

70.     The Fourth Circuit has held that a person held in pretrial detention necessarily "makes out a due process violation if he shows 'deliberate indifference to serious medical needs' … because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir. 1988) (citations omitted)).

71.     In order to show that defendants acted with deliberate indifference, a plaintiff must show that (1) he or she was exposed to a substantial risk of serious harm, and (2) that defendants knew of or disregarded that substantial risk to plaintiff's health or safety. *See, Farmer v. Brennan,* 511 U.S. 825, 837-38 (1994); *See also, Thompson v. Virginia,* 878 F.3d 89, 97-98 (4th Cir. 2017).

72.     A plaintiff "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *See, Danser v. Stansberry,* 772 F.3d 340, 346-47 (4th Cir. 2014). Such a claim "may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *See, Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir. 2003).

73.     A plaintiff must also show that the prison or detention official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the detainee's safety, or evidence that officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a

substantial risk 'in the usual ways, including inference from circumstantial evidence" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Raynor v. Pugh,* 817 F.3d 123, 128 (4th Cir. 2016).  Here, undersigned counsel, Sharareh B. Hoidra, notified U.S. Immigration and Customs Enforcement of the Plaintiff's underlying medical condition on May 19, 2020, which was acknowledged, but disregarded as no further protections were provided to the Plaintiff.

**C.  Plaintiff Has a Right to a Reasonable Accommodation Under the Rehabilitation Act**

74.     Section 504 of the Rehabilitation Act requires executive agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies.  29 U.S.C. § 794(a).

75.     DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department."  6 C.F.R. § 15.30.

76.     To state a claim under the Rehabilitation Act, a plaintiff must establish "(1) that he has a disability; (2) that he is otherwise qualified for the benefit in question; and (3) that he was excluded from the benefit due to discrimination solely on the basis of the disability."  *Baird v. Rose,* 192 F.3d 462, 467 (4th Cir. 1999).

77.     To the extent possible, the Americans with Disabilities Act ("ADA") and the Rehabilitation Act should be construed to impose similar requirements; therefore, they require a plaintiff to demonstrate that the same elements to establish liability.  *Halpern v. Wake Forest Univ. Health Scis.,* 699 F.3d 454 (4th Cir. 2012).

78.     A qualifying disability is any physical or mental impairment that "substantially limits one or major life activities."  42 U.S.C. § 12102; *See also,* 29 U.S.C. § 705; 6 C.F.R. § 15.3(d).  A "major life activity" includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" as well as "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12102(A)-(B).

79.     The ADA mandates that "[t]he definition of disability . . . be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the statute]." 42 U.S.C. § 12102(4)(A).

80.     The Fourth Circuit has determined that a temporary impairment may qualify as a disability under the ADA if it is "sufficiently severe" to substantially limit a major life activity. *See, Summers v. Altarum Inst.,* 740 F.3d 325 (4th Cir. 2014).

**D. This Court Has the Authority to Order Plaintiff's Release to Protect His Constitutional and Statutory Rights.**

81.     "A district court enjoys wide discretionary authority in formulating remedies for constitutional violations."  *See, Smith v. Bounds,* 813 F.2d 1299, 1301 (4th Cir. 1987).  Moreover, "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population.  *See, Brown v. Plata,* 563 U.S. 493, 511 (2011).

82.     Although the Fourth Circuit has not had occasion to address this issue, courts in other circuits have exercised the authority to order release as a remedy for constitutional violations. *See, e.g., Duran v. Elrod,* 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied,* 465 U.S. 1108 (1984) (concluding that the court did not exceed its authority in directing release of low-bond pretrial

detainees as necessary to reach a population cap).

83.     In light of the severe threats posed by COVID-19, a growing number of federal courts have also ordered the release of persons detained in immigration detention. *See, e.g., Xochihua-James v. Barr,* No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing a detainee from immigration detention "in light of the rapidly escalating public health crisis"); *Hope v. Doll,* 1:20-cv-00562-JEJ, Dkt. No. 11 (M.D. Pa. Apr. 7, 2020) (granting TRO releasing high-risk individuals in immigration detention due to the dangers of COVID-19); *Hernandez v. Wolf,* 5:20-cv-00617-TJH-KS, Dkt. No. 17 (C.D. Cal. Apr. 1, 2020); *Castillo v. Barr,* 20-cv-00605-TJH, Dkt. No. 32 (C.D. Cal. Mar. 27, 2020) (same); *Coronel v. Decker,* 20-cv-2472-AJN, Dkt. No. 26 (S.D.N.Y. Mar. 27, 2020 (same); *Basank v. Decker,* 20-cv-2518-AT, Dkt. No. 11 (S.D.N.Y. Mar. 26, 2020) (same); *Fraihat v. Wolf,* 20-cv-00590-TJH-KSx (C.D.Cal. Mar. 31, 2020) (same); *Thakker v. Doll,* 1:20-cv-00480-JEJ, Dkt. No. 47 (M.D.Pa. Mar. 31, 2020) (ordering releases from two facilities in Pennsylvania that lacked confirmed COVID-19 cases); *see also, Ronal Umana Jovel v. Decker,* 12-cv-308-GBD, Dkt. No. 27 (S.D.N.Y. Mar. 26, 2020) (ordering release under *Mapp v. Reno,* 241 F.3d 221 (2d Cir. 2001)); *Jimenez v. Wolf,* 18-cv-10225-MLW (D.Mass. Mar. 26, 2020) (same).

84.     Courts have similarly released numerous individuals held or incarcerated under the federal criminal system. *See, e.g., United States v. Meekins,* Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to people in detention); *United States v. Davis,* No. 1:20-cv-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *United States v. Muniz,*

Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison system nonetheless remain particularly vulnerable to infection."); *United States v. Hector,* Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to individuals in prison); *United States v. Grobman,* No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of a fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Mclean,* No. 19-cr-380-RDM, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for Defendant candidly concedes, the facts and evidence that the court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception.  That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Harris,* No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *In re Request to Commute or Suspend County Jail Sentences,* Docket No. 084230 (Supreme Court of New Jersey, Mar. 22, 2020) (releasing a large class of defendants serving time in county jail "in light of the Public Health

Emergency" caused by COVID-19).

85.     The unprecedented coronavirus pandemic unquestionably calls for individuals' release, as multiple health experts have opined, and numerous courts have recognized, that no other measures would be sufficient or appropriate, especially for individuals with special vulnerability to sever illness or death from COVID-19.

86.     The Rehabilitation Act provides for "reasonable accommodations" to ensure that individuals are not deprived of access to federally-administered benefits because of their disability. Because there is no reasonable accommodation available to protect vulnerable individuals from contracting COVID-19, and thereby being denied access to removal proceedings due to serious illness or even death, release to home confinement, with strict conditions, is the only sufficient accommodation available.

## VI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS (UNLAWFUL PUNISHMENT)

87.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

88.     The Fifth Amendment to the U.S. Constitution guarantees civil detainees, including immigration detainees, the right to be free from punitive conditions of confinement.   The government violates this guarantee when conditions of confinement lack a reasonable relationship to any legitimate governmental purpose, *i.e.* when a custodian's actions are excessive in relation to their purpose.

89.     Defendants have subjected Plaintiff to conditions of confinement that increase his risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure.  Plaintiff's underlying medical condition – of which Defendants are or should be aware of – render him

especially vulnerable to sever illness or even death if he contracts COVID-19.  Defendants are therefore subjecting Plaintiff to an unreasonable risk of serious harm and punitive conditions, in violation of his rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

90.     Defendants' continued detention of Plaintiff fails to adequately protect him from the risks of contracting COVID-19.

91.     Plaintiff's ongoing confinement lacks a reasonable relationship to any legitimate governmental purpose or is excessive in relation to its purpose.

92.     Defendants continued detention of Plaintiff is punitive and therefore violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

**SECOND CLAIM FOR RELIEF: VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS (DELIBERATE INDIFFERENCE)**

93.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94.     The Fifth Amendment to the U.S. Constitution guarantees civil detainees, including immigration detainees, the right to be free from punitive conditions of confinement.  The government violates this guarantee when it acts with deliberate indifference when failing to safeguard the health and safety of those in its custody.

95.     The government acts with deliberate indifference when it exposes detainees to a substantial risk of serious harm, and when it knows of or disregards that substantial risk to a detainee's health or safety.

96.     Defendants have subjected Plaintiff to conditions of confinement that increase his risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure.  Plaintiff's underlying medical condition renders him especially vulnerable to severe illness or death if he was

to contract COVID-19.  Defendants are therefore subjecting Plaintiff to a substantial risk of serious harm or death.

97.    Defendants have known of or disregarded the substantial risk of harm to Plaintiff's health and safety.

98.    Defendants have acted with deliberate indifference to Plaintiff's health and safety, in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

**THIRD CLAIM FOR RELIEF: VIOLATION OF THE REHABILITATION ACT (FAILURE TO PROVIDE REASONABLE ACCOMODATION TO PERSONS WITH DISABILITIES**

99.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

100.    Section 503 of the Rehabilitation Act requires federal agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies.  29 U.S.C. § 794(a).

101.    DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department."  6 C.F.R. § 15.30; see also 29 U.S.C. § 794(a). The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons."  34 C.F.R. § 104.4(b)(4).

102.     The removal process (formerly known as "deportation"), which includes adjudications of applications for relief from removal in immigration court, is a benefit administered by DHS and Plaintiff is entitled to participate in the removal process.  The services, programs, and activities within the detention centers where DHS has detained Plaintiff receive substantial federal financial assistance.

103.     Plaintiff's underlying medical condition qualifies as a disability for purposes of the Rehabilitation Act.  29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

104.     By exposing him to a heightened risk of contracting COVID-19 and thereby serious illness and/or death, Defendants are preventing Plaintiff from participating in the removal process and the services, programs, and activities within the Howard County Detention Center by reason of his disability.

105.     By failing to take account of his special vulnerability to severe illness or death if he was to contract COVID-19, Defendants are preventing Plaintiff from participating in the removal process and the services, programs, and activities within the Howard County Detention Center by reason of his disability.

106.     By failing to provide Plaintiff with adequate protection from COVID-19 through the only effective means to reduce the risk of severe illness or death, Defendants have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the Howard County Detention Center with respect to Plaintiff.

107.     The only available "reasonable accommodation" that would mitigate Plaintiff's disability is release from detention to home confinement with monitoring.  Defendants have failed to implement this reasonable accommodation, which would not be unduly burdensome nor require

a fundamental alteration in the removal process or the services, programs, and activities of the Howard County Detention Center.

108.    Defendants' ongoing detention of Plaintiff constitutes discrimination because it is either disparate treatment of, or at the very least has a disparate impact on, people with qualifying disabilities who are at severe risk of serious illness or death if he was to contract COVID-19.

109.    For these reasons, Defendants' ongoing detention of Plaintiff violates the Rehabilitation Act.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Honorable Court to:

(1)    Issue a writ of habeas corpus and order Plaintiff's immediate release or placement in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that his continued detention violates the Due Process Clause of the 5th Amendment of the U.S. Constitution and/or the Rehabilitation Act;

(2)    In the alternative, issue injunctive relief ordering Defendants to immediately release Plaintiff or place him in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that his continued detention violates the Due Process Clause of the 5th Amendment of the U.S. Constitution and/or the Rehabilitation Act;

(3)    Declare that Defendants' continued civil detention of individuals at increased risk for severe illness, including persons of any age with underlying medical conditions that increase the risk of serious illness or death upon contracting COVID-19 violates the Due Process Clause of the 5th Amendment of the U.S. Constitution and/or the Rehabilitation Act;

(4)     Issue an Order to Show Cause why this petition for writ of habeas corpus should not be granted within three (3) days of the filing of this petition, per 28 U.S.C. § 2243;

(5)     Schedule this petition for writ of habeas corpus and Order to Show Cause for a hearing within five (5) days (per 28 U.S.C. § 2243), to be conducted by audio and/or video teleconference pursuant to this Court's Standing Order 2020-11, issued by Chief Judge James K. Bredar, on May 22, 2020 (*In Re: Court Operations under the Exigent Circumstances Created by COVID-19,* MISC. NO. 00-308);

(6)     Award Plaintiff all costs incurred in maintaining this action, including reasonable attorneys' fees, expenses and costs under the Equal Access to Justice Act (EAJA), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and any other basis justified by law; and

(7)     Grant Plaintiff any other and further relief as this Court deems just and proper.

Respectfully submitted on this 26th day of May 2020.

<div style="margin-left:40%">

/s/Sharareh B. Hoidra, Esquire
Sharareh B. Hoidra, Esq.
U.S. District Court Bar # 19615
SHERI HOIDRA LAW OFFICE, LLC
1777 Reisterstown Road, Suite 385
Pikesville, MD  21208
Tel:  (443) 660-7513; Fax:  (443) 660-7514
SHoidra@sherihoidralaw.com

/s/Brian S. Green, Esquire
Brian S. Green
U.S. District Court Bar # 19493
THE LAW OFFICE OF BRIAN GREEN
5930 N. Figueroa Street, #421239
Los Angeles, CA  90042
Tel:  (443) 799-4225
Fax:  (323) 285-0056
BrianGreen@greenUSimmigration.com

Attorneys for Plaintiff

</div>

## **VERIFICATION**

I, Sayoh Mansaray, am familiar with Alpha Ibrahim Bah Mansaray, including his medical conditions and his detention at the Howard County Detention Center, and have personally reviewed and verified the contents of this petition for habeas corpus. This verification is offered in compliance with 28 U.S.C. §2242.

Sayoh Mansaray.
Signature

Date: May 25, 2020